Good morning, Your Honors. May it please the Court, my name is Joe Kravis. I represent the appellants Victor and Laura Lee Giotta. I'd like to reserve one minute of my time for rebuttal. Before the Court today is the Giotta's appeal from the dismissal of their Fair Debt Collection Practices Act claim under section 1692E2A and the derivative claims under the Torgman v. Collins Financial Services case. 1692E broadly prohibits a debt collector from engaging in any communication to collect a debt that is misleading, deceptive or false. Counsel, let's get right to the point because you don't have a lot of time. In this instance, the concern that you have is with a passed on charge from another entity that is a separate corporation. And the disclosure did show the actual amount of the charge accurately as I understand it, that the third party vendor charged for the services and the services were actually performed and there was no markup by Ocwen itself. Is that all true? That is not entirely accurate. Okay. What is inaccurate about that? We do allege that Ocwen got a kickback. We also allege that the service that was performed, the service that the billing statement said, and you have to look at this through the prism of the least sophisticated debtor. That's what Torgman said, somebody who's uninformed, naive, gullible. And if you look at it through that prism, they get a billing statement that property valuation expense or property valuation expense BPO. Separately, they get definitional statements from the company about these charges that say these charges are for brokers or other qualified individuals to provide an estimate of the market value of the property. Another one says specifically that they'll be using a certified real estate agent. In this case, the broker got $0 to $30 for performing the BPO. The zero is because they have a little deal to basically get the listing if the property goes into foreclosure. So they'll get $0 to $30. There's a $100 fee. The other $70 goes to this spun-off entity called Aquasource. It is legitimately a separate corporation as far as I can tell. Yes? It was spun-off. They do share executives and so forth, but they are a separate entity. That's not my point. They're a separate, legally separate entity. They're a legally separate entity. And so then what service do they perform? They don't perform the valuation of the property. They perform a different service. The service they perform, we say, is management fee. Aquan says in its brief is profit. Now, you know, if you are the least sophisticated debtor and you read your statement and you read the explanation they gave to you, the only thing you're going to get out of that is that this service was performed by a broker to evaluate the value of my property. You're not going to... I have difficulty... You're not really answering Judge Graber's question. What she said, was there anything inaccurate in what was said, in what was billed? The amount billed was passed through. Well, you're suggesting that a debt collector must not only itemize the fees and the costs, but also provide a breakdown of the fees and the costs associated with the third-party vendor. That's really your argument. Your Honor, what I'm suggesting is that the FDCPA places a heightened... Well, answer my question. Isn't this your argument? You really want a breakdown of the There is no question that what was passed on was adequately given notice about. There was $100 charged, but what was it charged for? Zero to 30 was charged for the actual... So you want a breakdown. I want a breakdown. I want a breakdown. Well, let's assume... I didn't do it. Yes. I'm sorry. In real life, you know, let's say I have a general contractor. I do have a general contractor working on my house. And, you know, his billing will include, you know, $400 charged by the plumber, separate entity, for fixing the bathtub drain. And that's, you know, if that's the $400, if that's true that the plumber actually charged him $400 and he charges me $400 and they did fix the drain, why is it deceptive if I don't know, you know, which employee did it and how many hours it took and what amount of that is profit to the plumber? And, I mean, why is that deceptive? It may be incomplete, but that's different than deceptive. Two things. One, I think we have to understand the backdrop. The backdrop is Congress created the FDCPA to put a heightened duty disclosure on debt collectors. Why did they do it? They did it because they want to put in the hands of this unsophisticated borrower information that would allow them to say, well, what next step do I take? Would you be making the same argument if this third-party vendor were, you know, Jane Smith Incorporated who never, you know, had any relationship with Ocwen? Yes, absolutely. So you think that you have to inquire of your third party everything that goes into their bill so that you can pass that along? Well, if they are performing a different service, which AltaSource did, they didn't do the property valuation. They did something else. We say they did some sort of management or something else. They're trying to claim it's profit. That's really a discovery issue. But you have to accept our allegation is true. We say it's a management fee. Okay. Well, why is this important? Under the deed of trust, fees that are charged are subject to the reasonable and necessary provision. Now, an unsophisticated debtor could look at a disclosure that says, okay, it's $0 or $30 for the broker. It's $70 to $100 that goes to AltaSource for performing what? Profit or management fee? They could say that's unreasonable. But we know for sure that it's a market rate because of the decree, correct? Well, it's not a market rate for what they were actually charging. It doesn't really matter if it's a market rate. It matters what it is. Just a minute. Just a minute. Listen again to what Judge Graper is asking you. There's a consent judgment that allows the use of affiliated third party entities. It's approved as long as the pricing is considered reasonable through an annual evaluation of market services. And that's right here in this case. So there is a consent judgment. The AGs of all of these states who entered into this consent have said that's fine to do what we're doing here as long as it's considered reasonable through an annual evaluation of the market services. So that also says they're not allowed to put add-on charges or charge up. Well, just a minute. Nobody added on here. You had every indication of every charge which was made. There's no add-on by the debt collector. The charges were itemized. Well, you did mention kickback. Will you tell us more about that? Because I know that in paragraph 54 of the Second Amendment complaint, you talk about a data access and service agreement. What did you mean by kickback? And also, relatedly, in your answer to Judge Graber's question, that you'd make the same argument if it was a truly independent third party. Then what's the relevance of the kickback allegation? Right. Well, two points. One, it is a fact that there is a kickback. And that would be another disclosure that would have to be made, how much Aukman got out of this. Secondly, as far as the validity of the debt, I mean, this Court has said in the Baker case, citing to the legislative history for the FDCPA, that whether or not the debt is valid is irrelevant under 1692e. I mean, the whole purpose of 1692e is to heighten the disclosure requirement to say, look, let's look at what they're charging them for. All right? The only thing this borrower is going to know here is that they're being charged for evaluation of the property. Yet something separate was done by a different entity called Altasaurus that wasn't identified. What they did wasn't identified. How much they got wasn't identified. And this borrower now can't know, doesn't have the information to say, well, okay, well, maybe this isn't a reasonable or necessary charge and I should challenge it. Maybe I should go to the CFPB and say, boy, they weren't complying with the consent order by the markup. What's the relevance of your allegation of a kickback? The relevance of the allegation of the kickback is twofold. Originally, it was relevant, of course, to the RICO claim. But now here it's relevant that if Aukwin got an additional part of this money, they'd have to disclose that they got part of it. And if you disclose they got part of it, this is a couple things. One, it goes to whether or not the contract was breached. It goes to whether or not the CFPB order was breached. And it's certainly at a minimum, which Torgman says, would change what the borrower is going to do in reaction to getting this debt notice. They're going to start asking questions. And even if those questions lead to the conclusion that the debt is valid and they should pay it, it's going to affect how they approach this because it's going to raise questions for them to ask. And that's the whole point of the FDCPA. That's the whole point of 1692E. That's what we're trying to redress here. Thank you, counsel. We'll give you a minute for rebuttal when the time comes. We asked a lot of questions. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. My name is Russell Perdue. I represent the Eppley-Aukwin Loan Servicing. The district court dismissed this case for two separate and independent reasons. We've spent the morning so far talking about the first of those, that Aukwin made no false or deceptive statements under the FDCPA. The second is the notice provision of the contract that the jihadists did not comply with. The jihadists need to show that the district court got both of those issues wrong in order to win reversal. I'm most interested in the first issue. Don't we have to assume, as alleged in paragraph 54 of the Second Amendment complaint, that there was a kickback? Well, Judge Simon, I think you rightly identified that paragraph 54 is all we have on that. And there does need to be more than simply the characterization of it as a kickback. All paragraph 54 tells us is that AltaSource, which has been acknowledged to be a separate entity, entered into a contract with Aukwin in which services were terminated. And it alleges that at some point the contract was terminated. That doesn't make that a kickback. That makes that payments for services rendered. But it's alleged that there were actually no valuable services provided or not at that level based upon the change in 2015, right? Well, all it says is that the contract was terminated and there weren't any public disclosures about some big shakeup in their business. So therefore, the court should assume that there was never any valuable services provided. I don't think that that fact plausibly supports the conclusion of a kickback. Let me ask you a different hypothetical. Am I correct that if Aukwin basically went out and hired people to do property valuations and inspections and then added a markup, that would have to be disclosed, right? Well, certainly under the concern, it would run afoul of the consent order. Even apart from the consent order, just under the FDCPA, wouldn't you have to disclose a markup? No. I don't know that you would. That's not my case. I would take that case and I would tell the client that they have a decent argument. So I don't know that you would. But it certainly would be a tougher case than this one. Well, tell me, why wouldn't you have to? Let's say the evaluations cost $15 to $30 and you added $70 and you charged $100. Why wouldn't you have to disclose that markup? Well, one reason why you wouldn't is that paragraph 14 of the deed of trust states that the lender, is the word that it uses, can charge fees for property inspections and property valuations in connection with that. And I think that that could encompass, and I don't want to get too far down this road. I'll go as far as you'd like, but because it's not the case that we have here. But I do think that it's reasonable, it would be reasonable for a servicer to perhaps include some of its own costs. Now, the regulator has said, this is not going to be something you guys can make any profit on. You have to pass this along. Not only can you not make a profit, you can't even allocate any overhead to it. Well, if you take that as a given and say that AQUIN can't make a profit on it, then I would say the same result would follow if AQUIN had a wholly owned subsidiary that it controlled. Now, here we don't have a wholly owned subsidiary, but we do have a company that was created by the officers of AQUIN, allegedly controlled by the officers, and allegedly AQUIN receives payments back from that company. Why isn't that just as problematic as if AQUIN or a wholly owned subsidiary got some additional payments? I can see the concern that you have, which you would have if, for example, the servicer under this consent order or other obligation to not make a profit says, okay, well, then let's just make up this other company, and we'll have them order the services and pay $10 and charge us 50, and then we'll pass the 50 on. And that company is going to be a total sham. And, in fact, there was a case, Bias v. Wells Fargo, that alleged something like that, that the affiliate generated false invoices. The servicer paid the service provider the reduced amount directly, paid the $10 directly to them, but the affiliate just fabricates a $50 invoice to justify passing $50 along. Yes, that would be a problem. You couldn't do that. That's a sham. But here, there aren't facts alleged to say that AltaSource is a sham entity set up to do that. In fact, what the allegations of the complaint show is that AltaSource does provide value. The Second Amendment complaint alleges that AltaSource negotiates with these service providers and gets discounts on a volume basis. And, in fact, it refers to over 100,000 BPOs a year. Which it doesn't seem to pass on, at least as alleged in the Second Amendment complaint. The discount? Yes. Well, and I don't think that it has to do that. It is a third party. And if it's managing 100,000 BPOs or more a year, that takes people. That takes equipment. That takes infrastructure. It can't just pass on that cost directly. And I think that Judge Graber started to get to the unworkability of this duty to disclose. You know, plaintiffs are asking for a breakdown. And first I want to point out, there's no legal authority for that at all. No statute. No regulation. The CFPB looked at this issue. The New York Department of Financial Services looked at the issue of using affiliated for-profit service providers and said, servicers, you can do that as long as it's a market rate. We're not going to prohibit you from doing it. We're not going to require the disclosures that they asked for. So there's no basis for it, number one. There are cases, none of them involve that. They all involve an itemization that the GIADA has received. Property inspection fees, property valuation fees. Break it out. Don't lump it all together. But they're asking for a sub-itemization. Property inspection fee, cost, profit, overhead, things like that. So there's no legal basis for it, number one. But number two, and the Walker case allows specifically affiliated for-profit vendors who make a profit, a $3 profit on the property inspection. The court said that's okay. But beyond that, unworkability. The GIADA seemed to say, well, you could use AltaSource, but AltaSource has to hire a third party. Well, where is that set? Nothing says that. Nothing requires that. But even if AltaSource did that, even if AltaSource had an army of property inspectors and property evaluators, that fee that they charge and pass on is still going to include an element of overhead, their real estate, their equipment, their cars and trucks, their marketing and billing department, and it's still going to include an element of profit. All businesses have overhead. All businesses earn profit. How do you break that down? How do you allocate that overhead in the fee to give the breakout and the disclosure that the GIADA say is legally required? I submit that that is something that isn't workable. And if that is going to be brought about, if that's going to be something we decide needs to happen going forward, we have to rely on regulators to do that, to weigh that, to figure out all of that complexity as to what you break out. Private lawsuits are kind of a blunt instrument to cobble together such an exacting disclosure duty. I don't think that it's appropriate. And here, if the court reversed and said, no, you had to disclose that, the answer or the question my client would ask me is, well, how in the world was I supposed to know that? And I would have no answer for them because that disclosure duty doesn't exist anywhere. I understand the concern if you had a truly sham entity set up specifically to circumvent this requirement that a servicer not mark it up and profit it. And that case has been filed in the bias case. It got past the motion to dismiss. And that resulted in a class-wide settlement. I have no idea if that's what the servicer there did or not. But that allegation survived and that was dealt with. But we don't have those allegations here. We have no facts alleged. We have the legal characterization in paragraph 54. The bare characterization of that is a kickback. But we certainly don't have any facts of that. We have, we know, the New York Department of Financial Services and the CFPB did an exhaustive investigation into this. They raised some flags, but they didn't prohibit the conduct that the giada say should be prohibited. They did not require the disclosures that the giada say should be required. So this has been looked at. And that's in the context of servicing being a heavily regulated industry and nothing like that being required. Did you want to say anything about the deed of trust notice and opportunity? You know, I'll say, number one, the court doesn't need to reach that. If it finds no false statement under the FDCPA, it can leave it be. The only thing that I'll say about it is, you know, there's a question, does it apply to these types of claims? Yes, it does. The language of the provision is very broad. It says any judicial action, not just contract claims, based on conduct. So the question is, is this conduct under the contract? Yes, it is. It's charges that are specifically authorized by the contract. Can the servicer invoke it when it uses the word lender? We think that they can. Section 13 of the deed of trust says the benefits of the deed of trust can be invoked by assigns of the lender. Here the servicer is an assign of the servicing rights. We cite cases in our brief finding specifically that the servicer can invoke either the jury waiver provision or the notice provision under the deed of trust. And the district court obviously relied on the loan modification definition of lender to include servicer. But, again, you don't need to reach that if you affirm on the FDCPA. Thank you, counsel. Thank you, Your Honors. You have a minute for rebuttal. May I tell you what I'm specifically interested in is, number one, have you alleged that the AltaSource was set up as a sham? And if so, where do I find that in the second amendment complaint? And, secondly, what's your response to the unworkability problem? What do they need to disclose, especially if AltaSource had hired its own employees to do the property inspections and valuations? What do they then need to disclose under your theory? Well, we did allege that it is a sham. It's found in the RICO allegations throughout the complaint. Any particular paragraphs I should focus on? I don't have a particular paragraph in mind. I can get that and submit that afterwards. The second question is workability. It's very workable. If you have a separate entity that does something different, say what they did and how much they got. That's very easy here. One entity was a broker, performed a service, got $0 to $30. Say broker did valuation, $0 to $30. Management fee to AltaSource for that valuation, $70 to $100. This gives the information to the borrower to allow the least sophisticated debtor to not have a disadvantage in charting a course and how they're to respond, which is what Torgman said. The course would be I can ask a question, why is this $70 for some management when the broker only got $30? Is that reasonable? Does that violate my contract? Why did you pay this? And it allows the debtor then to chart the course, to ask the questions. Maybe it concludes it's valid. On workability, though, what if AltaSource did the work itself with its own employees? Then would you still contend they would have to disclose their costs and their profits, and if so, how? I think the way they would do it then is they would say we did a property valuation. This property valuation includes a broker and our internal administrative costs, period, $100. That's how they would do it if they are a single entity because they got all the money. Here, part of the money went to one entity for one thing, the other part of the money went to another entity for the other, and they only disclosed half that transaction. So where is the borrower? The borrower is in the dark. The borrower doesn't know how to respond to this or even know to ask a question because he doesn't know about the other entity, what they got the money for, or that they even got any money. Thank you, counsel. Thank you for your time, Your Honors. The case just argued is submitted. We appreciate very much the helpful arguments from both counsel. Our next argued case, if I may be mispronouncing it, but is Jonan versus the Merit Systems Protection Board.
judges: Graber, N.R. Smith, Simon